Filed 6/22/15  In re Thomas C. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re THOMAS C., et al., Persons Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>TRACY C.,<br><br>        Defendant and Appellant. | A143373<br><br>(Alameda County<br>Super. Ct. Nos. OJ12018824,<br>                    OJ12018825) |

Following a Welfare and Institutions Code section 366.26[1] hearing, the juvenile court terminated the parental rights of Tracy C. (Mother) and Thomas C., Sr. (Father) to their children Thomas C. (Thomas) and Lily C. (Lily).  On appeal, Mother[2] maintains the court erred by failing to apply the "beneficial relationship exception."  (§ 366.26, subd. (c)(1)(B)(i).)  We conclude that Mother's argument lacks merit and affirm.

**BACKGROUND**

On December 1, 2011, the Lake County Department of Social Services filed a section 300 dependency petition on behalf of Thomas and Lily, then two years old and

_____

[1] Further statutory citations are to the Welfare and Institutions Code unless indicated otherwise.

[2] Father has not appealed from the juvenile court's order on his own behalf.

1

six months old, respectively. The petition stated section 300, subdivision (b) allegations: (1) the parents failed to abide with a voluntary family maintenance case plan and safety interventions; (2) the parents missed medical appointments for Lily, who had been born prematurely and was "medically fragile"; (3) the parents had an "ongoing physically and emotionally abusive domestic violent relationship" that posed a threat of physical and emotional harm to the children; (4) Thomas exhibited unusually aggressive and violent behaviors due to his parents' domestically violent relationship; (5) Mother was developmentally delayed, lacked "the basic knowledge related to parenting skills," and was "incapable of providing adequate care and supervision" for Lily; (6) Mother had admitted shaking Lily in attempting to stop her crying; (7) Father had a history of substance abuse, including marijuana, methamphetamine, cocaine, ecstasy and alcohol, rendering him incapable of providing adequate care and safety for Lily; and (8) the parents had been advised that the exposed electrical wiring and gas line in the home was an immediate safety hazard, but they had not arranged for repairs as they had previously agreed.

On February 14, 2012, the Lake County Superior Court sustained the petition and declared Thomas and Lily dependent children of the juvenile court. Following a March 5, 2012 disposition hearing, the court ordered the children removed from the parents' custody and ordered reunification services for both parents.

At the disposition hearing, Father informed the court that the parents had moved to Oakland, California in Alameda County. On March 26, 2012, the Lake County Superior Court transferred the matter to Alameda County. On May 8, 2012, the Alameda County Superior Court accepted the matter on transfer.

On August 3, 2012, the Alameda County Social Services Agency (Agency) filed a status report for the six-month review hearing. The children had initially been placed in separate foster homes in Lake County, but Lily had been moved into Thomas's foster home on July 30, 2012. The report stated that the children were bonded to their birth parents and maternal grandparents. Prior to their move to Alameda County, the parents had been unable to maintain a weekly visitation schedule. There had been no visits since

2

May 22, 2012, and the parents had offered no explanation, though it seemed that the parents' dependence on public transportation was the issue because no bus routes could get the parents to and from visits within the same day.

The status report stated that Mother had successfully completed 12 weeks of parenting classes and had recently been referred for a substance abuse assessment and domestic violence education. She had also been referred to a program for parents with disabilities parenting a child with disabilities. Father minimized his participation in domestic disputes and denied the need for court intervention. He had completed a parenting course and 40 weeks of a 52-week domestic violence course. He had not completed court-ordered anger management classes. The report recommended continued reunification services. On September 14, 2012, the court adopted the Agency's recommendations and set a 12-month review hearing.

The Agency submitted a 12-month hearing status report on January 17, 2013, recommending continuation of reunification services and out-of-home placement for the children. The children had been placed in the home of their maternal grandparents on August 31, 2012. The parents had regularly attended weekly supervised visits with the children since August 16, 2012. During visits, Father would spend "a substantial amount of the visits criticizing the maternal grandparents" and would become "visibly and verbally angry" at Mother for failing to protect the children from her parents. Mother had completed a parenting class and 12 of 22 domestic violence group sessions. She appeared unable to protect herself from Father when he is angry. Father had been diagnosed with depression and anxiety but was unwilling to complete a medication evaluation or attend counseling. He had unsatisfactorily completed domestic violence and anger management classes. Father had exhibited domineering behavior with Mother, and Mother's service providers encouraged her to actively participate in domestic violence prevention courses. The social worker had made a referral for therapeutic visitation at The Gathering Place.

On February 1, 2013, the Agency filed an addendum report. The Agency now recommended termination of reunification services and a section 366.26 hearing to

3

establish a permanency plan of legal guardianship with the maternal grandparents. Father had threatened the therapist at The Gathering Place and terminated his participation in therapeutic visitation services. The maternal grandparents related that Thomas would exhibit negative behavior after visits with his parents. The social worker recommended suspending Father's visits with the children until he was engaged in an anger management program.

At a February 1, 2013 hearing, the court suspended Father's visitation with the children until he had completed four individual therapy sessions for anger management. The parents contested the Agency's recommendations.

The parents' contested 12-month review hearings, which subsequently became their contested 12- and 18-month review hearings, occurred on several dates between March 19, 2013, and February 20, 2014. On February 20, 2014, the court terminated reunification services for both parents and set a section 366.26 hearing. The court found that both Mother and Father had made minimal progress toward alleviating or mitigating the causes necessitating the children's out-of-home placement.

On May 28, 2014, the Agency filed a section 366.26 hearing report (366.26 report) recommending that the court terminate parental rights and order a plan of adoption. An adoption assessment had found the children to be adoptable, and the maternal grandparents were prospective adoptive parents. The report concluded: "While the parents have maintained regular visitation and contact with Thomas and Lily, the children have been out of their care for 2½ years. The visitation that has occurred has been complicated and at times difficult for the children. Neither Thomas nor Lily can look to either of their parents for the consistent care that is expected from a parent. Any benefit they might gain from the continuation of parental rights would be offset by the stability, consistency and permanency they will gain through adoption." Mother had not shown an ability to stand up to Father when he criticized her, her parents or the children. Mother was able to play with the children and show them affection, but she struggled with setting limits and appropriately correcting behavior. Despite a year of therapeutic and

4

supervised visitation, there remained concerns that Mother did not employ all the parenting techniques she had been taught.

The June 10, 2014 section 366.26 hearing was continued until August 6, 2014. On July 22, 2014, the Agency filed a status review report (366.26 status report). In the most recent visits, Thomas would greet his mother at the beginning of the visit, but Lily would not acknowledge her mother and would spend most of the visit playing with toys in the visitation room. When Lily became upset, Mother had a difficult time soothing her. Mother also had difficulty following through with timeouts for Thomas when he misbehaved. When visits were over, Lily appeared eager to get into her stroller and return to her grandfather. On May 27, 2014, neither child showed emotion toward Mother when they arrived, but both kissed mother at the end of the visit. When the children would leave their grandparents' care for visits with the parents, the social worker had observed them "clinging" to the grandparents. When returning to the grandparents after a visit, Thomas would excitedly shout "Grandpa, Grandma!," and Lily would scream with enthusiasm.

At the August 6, 2014 hearing, the court admitted the 366.26 report and 366.26 status report into evidence and the Agency concluded its case in chief. Both parents submitted on the issue of adoptability. Mother's counsel then called Mother as a witness. Mother visited the children on Tuesdays for an hour and a half. When Thomas would enter the room, he would say "Hi, mom" and embrace her. When Lily first would arrive, she would say "Mom." Mother then would pick Lily up and they would embrace. Mother and Thomas would play with toys together and she would teach him the alphabet. Mother and Lily also would play with toys and draw together. She believed that the children enjoyed their visits with her and viewed her as a parent. If the children were hungry, she would give them food or take them out to eat. Mother denied that Thomas ever became upset or misbehaved during visits. At the end of a visit, the children would say "Mom, I miss you." Thomas was attached to Father and they would hug at the end of a visit. Lily called Father "Daddy." Mother testified that the children also loved their grandparents and would be happy to see them at the end of her visits.

5

Father's counsel called Father to testify. Father stated that Thomas lived with Mother and Father from birth to age two and a half. During that time he helped care for Thomas—feeding him, bathing him and changing diapers. Father currently had a monthly visit with the children, who are excited to see him. The children had at first been hesitant to leave at the end of visits, but now the departures were routine for them. Father stated that in the last three visits Thomas seemed sad and had asked "a couple of times" when he could come home. Neither child ever wanted a visit to end early and both wanted longer visits. Both children called him "Dad." Father denied becoming sidetracked during visits concerning the care provided by the grandparents. He believed the children would benefit from a continuing relationship with him.

The Agency called social worker Leslie Calhoun as a rebuttal witness. Calhoun supervised visits with the parents from January 2014 until July 2014, when a therapist began to supervise them. The parents had not had unsupervised visits because of "safety concerns": "[T]he kids are quite active and getting into things. And it's throughout the years of visitation that I've read and from what I've witnessed just in the last six months, is the parents do struggle intervening. [¶] And there's also the issue of how the relationship between [the parents] impacts the children. Specifically, [Father] speaking . . . derogatorily towards [Mother] and also the aggressive manner for which he has been with the children, as well as the aggressive way—of which he has spoken about the grandparents in front of the children."

Calhoun said that Thomas was aggressive with Lily, taking things from her and "if he can't get things, he will kick or hit or bite." She had not observed appropriate intervention on the parents' part. Lily has cerebral palsy and "low frustration tolerance," so she might start to cry "and kind of meltdown." The parents would try to console her, but Lily would not respond. Calhoun said that Mother could not know how the children reacted to seeing their grandparents at the end of visits because handoff of the children was structured so that the parents never saw or had contact with the grandparents. Calhoun testified that Lily was unable to say "I miss you," "mom," or "dad." She had never heard Thomas say "I miss you" or that he wanted to return home with the parents.

When the grandparents pick up the children at the end of a visit, the children are excited. When Thomas became upset during visits, he pushed away the parents if they tried to intervene. Calhoun said that Mother's testimony that Thomas never misbehaved during visits was inaccurate. When a visit begins, Lily usually does not make eye contact with the parents and either wants to stay in her stroller or go straight to her own activity. Thomas would be excited at the beginning of a visit and call the parents "mom" and "dad." Because Thomas had lived in the parents' home for two and a half years, he had become attached to them, but Calhoun did not see it as "a secure attachment." Instead, she saw it as "disorganized": "I witness him as being anxious throughout the visits as evidenced by, similar to Lily, . . . his low frustration tolerance, disregulation very easily, kind of push back and forth or he will be really clingy but then push away." Thomas does not turn to the parents for support when he becomes upset and does not respond to the parents' attempts at intervention. "It does not appear that he sees them as protective caregivers or protective entities, but rather individuals he calls mother and father and who he has fun visits with." During visits, Lily would typically want to stay in her stroller or want to get back into it during the visit. Recently, the stroller has been taken from the visitation room after the children arrive to address that behavior. But at the end of a visit, Lily is excited to get back into the stroller. A psychologist had found "a consistent pattern of behavioral and emotional disregulation for Thomas that occurs in and following visits with his birth parents."

Calhoun believed that Mother was loving with the children and tries hard to implement the skills she has been taught, but has not been able to consistently discipline the children or set boundaries. She did not believe the children saw Mother as a person who provides protective care for them. She did not see the relationship as "a parentified relationship, a parent-child secured attachment."

Calhoun believed that a sudden drop in visitation would be difficult for Thomas because he was fond of his parents and enjoyed being with them. He would need a "narrative to help him understand what's going on" and visits could be transitioned slowly. But she believed that decreasing visits "could limit the aggressive behavior and

7

the on-and-off enuresis[3] because there is so much anxiety around visits." Lily exhibited little attachment toward the parents, so Calhoun did not believe that a drop in visitation would be detrimental: "If anything, it would be one less stressor in her life."

The hearing was continued to September 17, 2014. At the continued hearing, the court admitted into evidence an addendum report filed by the Agency on September 3, 2014. The court found the children to be adoptable and after closing arguments, the matter of whether the beneficial relationship exception applied was submitted for decision.

On October 1, 2014, the court determined that the beneficial relationship exception did not apply for either Thomas or Lily and terminated the parental rights of both parents.

Mother timely filed a notice of appeal on October 21, 2014. Father has not appealed.

## DISCUSSION

Mother contends that the juvenile court erred in terminating parental rights because she met her burden of proving that the beneficial relationship exception to termination of parental rights applied, and that insufficient evidence supported the court's finding otherwise.

"Under section 366.26, subdivision (c)(1), if the juvenile court finds by clear and convincing evidence that a child is adoptable, it will terminate parental rights unless it finds termination would be detrimental because of one of five listed exceptions. Under section 366.26, subdivision (c)(1)(A), the court may forego adoption and refrain from terminating parental rights only if a parent has maintained regular visitation and contact with the child *and* the child would benefit from continuing the relationship." (*In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 449.) "Once the court determines the child is

---

**3** Calhoun testified that Thomas had experienced daytime episodes of enuresis (involuntary urination), particularly after visits.

8

likely to be adopted, the burden shifts to the parent" to show that the beneficial relationship exception applies.  (*In re S.B.* (2008) 164 Cal.App.4th 289, 297 (*S.B.*).)

Here it was uncontested that the children were adoptable (by the maternal grandparents) and that Mother maintained regular visitation and contact with them.  Thus, the only issue in determining the applicability of the beneficial relationship exception is whether Mother met her burden of proving that the children would benefit to a sufficient degree from a continuing relationship with her.  "The 'benefit' prong of the exception requires the parent to prove his or her relationship with the child 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new adoptive parents.'  [Citations.]  No matter how loving and frequent the contact, and notwithstanding the existence of an 'emotional bond' with the child, 'the parents must show that they occupy "a parental role" in the child's life.'  [Citations.]  The relationship that gives rise to this exception to the statutory preference for adoption 'characteristically aris[es] from day-to-day interaction, companionship and shared experiences.  Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship.'  [Citation.]  Moreover, '[b]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement.' "  (*In re K.P.* (2012) 203 Cal.App.4th 614, 621.)

"The [beneficial relationship] exception must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond.  The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between the parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond."  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575-576.)  "We review a juvenile court's order on

the beneficial-relationship exception for substantial evidence."[4] (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1166, fn. omitted.)

Thomas and Lily were removed from their parents' custody on December 1, 2011. Lily was just short of seven months old and Thomas was less than two and a half years old. By the time the court terminated parental rights, Thomas had spent more than half his life outside his parents' home and Lily most of her life. The children's young age and the portion of their lives spent with other caregivers weighs against application of the beneficial relationship exception.

The Agency never denied that Mother loves the two children or that Thomas has an emotional bond with Mother. The emotional bond was demonstrated at an April 29, 2014 visit, when Thomas was observed to be "very clingy" with Mother and had a hard time separating from her at the end of the visit.[5] Thomas often asks to be held by Mother and kisses her. However, the existence of an emotional bond is not, in itself, sufficient to establish a compelling beneficial relationship. Mother's and Father's testimony that Thomas says he misses the parents asnd asks when he can go home with them was contradicted by the social worker, and we find nothing in the visit reports that supports the parents' testimony. Mother testified that Thomas does not misbehave during visits, but this was contradicted by Calhoun and the Agency reports. While Thomas

---

[4] As both Mother and the Agency recognize, some courts have applied different standards of review. (*In re K.P.*, *supra*, 203 Cal.App.4th at pp. 621-622 [question of whether beneficial relationship exists is reviewed for substantial evidence, whereas question of whether relationship provides compelling reason for applying exception is reviewed for abuse of discretion]; *In re C.B.* (2010) 190 Cal.App.4th 102, 122-123 [abuse of discretion standard governs review, but "pure" factual findings reviewed for substantial evidence]; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 [review is for abuse of discretion]. On the record before us, we would affirm under any of these standards. (See *Jasmine D.*, at p. 1351 [practical differences between substantial evidence and abuse of discretion standards are minor].)

[5] The April 29, 2014 visit was the only occasion we find in the record noting a difficulty separating from Mother at the end of the visit. During this visit, Oakland police officers had come to examine the children because Father had reported that the grandparents were abusing them. The social worker reported that the police visit had scared the children.

10

undeniably sometimes finds comfort in being with Mother, there is substantial evidence that visits with his parents are generally a source of anxiety. Calhoun testified: "I witness him as being anxious through the visits as evidenced by . . . his low frustration tolerance, disregulation very easily, kind of push back and forth or he will be really clingy but then push away." The grandparents reported that Thomas behaved negatively after visits. Moreover, Calhoun testified that both children excitedly greet their grandparents when visits are over.

With regard to Thomas, the juvenile court's decision to terminate parental rights was supported by substantial evidence. Mother argues that "the court did not give sufficient weight to evidence in support of the exception," but it is not our role to reweigh the evidence: "Here, as in many dependency cases, the case posed evidentiary conflicts. And, as is common in many dependency cases, this case obligated the juvenile court to make highly subjective evaluations about competing, not necessarily conflicting, evidence. As reflected in the juvenile court's ruling, the juvenile court considered the conflicting, competing evidence and essentially discounted mother's evidence in concluding that mother had failed to carry her burden of proof. It is not our function to retry the case. We therefore decline mother's implicit invitation to review the record so as to recount evidence that supports her position (reargument) with the object of reevaluating the conflicting, competing evidence and revisiting the juvenile court's failure-of-proof conclusion." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.)

Mother compares her case to that of *S.B.* In *S.B.*, the juvenile court had terminated the father's parental rights despite the fact that father had " 'complied with every aspect of his case plan.' " (*S.B.*, *supra*, 164 Cal.App.4th at p. 293.) It was only father's physical and emotional health that prevented reunification. (*Ibid.*) Father visited with S.B. three days a week, and S.B. became upset when visits ended and wanted to leave with father. (*Id.* at p. 294.) The Agency stated: " 'It pains the Agency not to be able to reunify [father] and his daughter [S.B.] because of his consistent efforts to alleviate and or mitigate the reasons his family was brought to the attention of the court.' " (*Ibid.*) Nevertheless, the Agency recommended termination of parental rights and the juvenile

11

court did so. (*Id.* at pp. 295-296.) The Court of Appeal reversed: "Here, S.B. derived comfort, affection, love, stimulation and guidance from her continued relationship with [father]. The fact that S.B. also had a strong, positive and significant relationship with her grandmother does not negate the harm S.B. would experience from the loss of her significant, positive, emotional relationship with her father." (*Id.* at p. 300.)

Though we acknowledge that Mother and Thomas have an emotional bond, the facts here do not compare to those of *S.B.* Mother's progress during reunification had been limited, and it was not simply her health that prevented reunification. The father in *S.B.* had significantly more frequent visitation (three times per week instead of the once per week visit in this case). Thomas, unlike S.B., had no difficulty ending visits, except on the one occasion we have noted, and Calhoun had not heard Thomas express a desire to go home with Mother. The Fourth District has made clear that *S.B.* is confined to its "extraordinary facts. It does not support the proposition a parent may establish the parent-child beneficial relationship exception by merely showing the child derives some measure of benefit from maintaining parental contact." (*In re C.F.* (2011) 193 Cal.App.4th 549, 558-559.)

Mother also stresses the fact that Calhoun testified that a sudden drop in visitation would be difficult for Thomas because "he does appear to look at his parents fondly and appears to enjoy seeing them." Calhoun thought that visits would have to be transitioned away slowly and that with an appropriate narrative and the help of a therapist, "decreasing visits could limit the aggressive behavior and the on-and-off enuresis because there is so much anxiety around visits. And what appears to be not feeling safe in visits." We fail to see how this testimony aids Mother. Any child who enjoys visits with a parent who has failed to establish the beneficial relationship exception may benefit from assistance when visits must decrease or cease after parental rights are terminated. Moreover, the primary significance of Calhoun's testimony is the anxiety that visits cause Thomas, evidence that supports the juvenile court's decision.

Mother finally alleges that it was improper for the court to consider that Mother would presumably continue to have contact with the children because her parents were

12

the prospective adoptive parents. There is no indication in the record that the court considered this in reaching its decision to terminate parental rights. After determining that the beneficial relationship exception did not apply, the court merely stated: "If there is any silver lining to this, at least with regard to the mother, the children are placed with your parents, ma'am. So just from a practical point of view, at least you presumably will have contact with the children."

Substantial evidence also supports the juvenile court's determination that Mother failed to demonstrate a beneficial relationship exception with regard to Lily, who had spent less than a fifth of her life in Mother's care. During visits, although Mother attempted to engage Lily, Lily would usually play on her own. Lily would often show no emotion towards Mother at the beginning of a visit and Mother had a difficult time soothing her when she became upset. Calhoun testified that Lily's stroller had to be removed from the visitation room because Lily preferred being in the stroller to other activities. As the juvenile court observed, she was "ready to go," "ready to be picked up [by the grandparents]." Lily was excited to be reunited with her grandparents after visits were over. Lily had no difficulty separating from Mother when visits were over—not even once.

Mother failed to demonstrate that she has a beneficial relationship with either Thomas or Lily so compelling as to avoid termination of parental rights and prevent the setting of a permanent plan of adoption for the children.

## DISPOSITION

The judgment is affirmed.

13

_____
STEWART, J.

We concur.

_____
KLINE, P.J.

_____
MILLER, J.